GUIDRY, Justice.
| TPefendant Terrance Carter was indicted on July 19, 2006, by a Red River Parish Grand Jury for the first degree murder of Corinthian Houston in violation of La. R.S. 14:30. After initially pleading not guilty, defendant changed his plea to a dual plea of not guilty or not guilty by reason of insanity.[1] The district court denied defendant’s motion to suppress his statements following a hearing conducted on July 16, 2008. Upon defendant’s motion for change of venue due to extensive pre-trial publicity, the district court granted the change of venue, and by mutual agreement between the defense and the State, venue was relocated to Lincoln Parish. The sequestered jurors were selected in Lincoln Parish and taken to Red River Parish for trial. Jury selection began on September 8, 2008, and was completed on September 19, 2008. Testimony commenced thereafter, and on September 25, 2008, the State and defense concluded their cases. After deliberating, the jury returned the unanimous verdict of guilty of first degree | ¡.murder. The penalty phase was conducted on September 26, 2008, and, having found the aggravating circumstances of aggravated kidnapping, second degree kidnapping, aggravated arson, and a victim under the age of 12 years, the jury returned with a unanimous recommendation that defendant be sentenced to death.
Defendant filed a motion for new trial, on which the district court conducted a hearing. During that hearing, defendant interrupted counsel and informed him that he wished to withdraw the motion. The district court continued to hear the testimony accepted as a proffer should the motion be withdrawn, but it ultimately granted the state’s motion to dismiss two of the claims asserted in the motion. The defense sought writs, and on September *507 24, 2009, the Second Circuit remanded for the trial court to determine defendant’s capacity to withdraw his motion and to rule on defendant’s request to withdraw his motion. The district court held a second hearing on October 6, 2009, after which it determined that defendant was competent to withdraw his motion for a new trial, and granted defendant’s request to withdraw the motion. The district court sentenced defendant to death on that same day.
Under La. Const, art. V, § 5(D), defendant now appeals his conviction and sentence of death asserting twenty-five assignments of error and three supplemental assignments of error. We address the most significant of these alleged errors in this opinion, and the remaining errors will be addressed in an unpublished appendix. After a thorough review of the law and the evidence, for the following reasons we affirm defendant’s first-degree murder conviction and the imposition of the death sentence.

FACTS

lsOn July 1, 2006, defendant happened upon an acquaintance, George Herring, at a convenience store in Coushatta. Defendant persuaded Mr. Herring to drive him to Natchitoches, claiming he wanted to visit his young son. When they arrived in Natchitoches, however, defendant directed Mr. Herring from house to house in search of a woman named Pamela Fisher, who had recently ended a romantic relationship with defendant. During this fruitless quest, defendant evidently learned that Fisher had rekindled her relationship with Marcus Houston, who was the father of her child, Corinthian Houston. Defendant then directed Mr. Herring to Mr. Houston’s residence, where five-year-old Corinthian, the victim, was playing with his older sister and his cousins. Corinthian greeted defendant enthusiastically, defendant took him into Mr. Herring’s van, and, after yet another fruitless search for Ms. Fisher, the three drove back to Coushatta. Back in Coushatta, defendant instructed Mr. Herring to drop them off in front of an abandoned house next door to where defendant was living with his mother. Defendant assured Mr. Herring that he had a way to return Corinthian to Natchitoches, so Mr. Herring went home.
When the victim’s father arrived home from work and discovered the victim was missing, the victim’s sister told him that defendant had picked him up. Mr. Houston then called Ms. Fisher and the police. Ms. Fisher and the police repeatedly contacted defendant in search of Corinthian throughout the evening, including going to defendant’s home, but defendant denied taking Corinthian and was not home when officers arrived there. At some point during this time period, defendant retrieved an extension cord and gasoline can from his mother’s washroom next door. Defendant then tied Corinthian to a chair in the abandoned house, poured the gasoline over him, set him on fire, and burned him to death.
LDefendant at some point thereafter crossed the street to the home of his neighbor, Huey Williams. Mr. Williams was not home, but defendant obtained an unspecified number of pills of the anti-psychotic medication Geodon from Mr. Williams’s house, which he then consumed. Defendant again spoke to police on the phone around 9:30 p.m., and he again denied having taken Corinthian. Thereafter, defendant passed out in Mr. Williams’s bed, where Mr. Williams found him sleeping at around 9:45 p.m. Defendant woke around 2 a.m. and returned home. Defendant’s mother contacted the police.
On July 2, 2006, officers arrested defendant for kidnapping Corinthian and, between 2:30 and 3:00 a.m., transported him *508 to the police station. After officers arrested defendant, his mother called one of her other sons and asked him to look in the abandoned house next door. She was concerned that Corinthian may have been restrained there, because she found it unusual that defendant had spent so much time there throughout the day. When her son arrived, by the light of his cellular phone (the house had no electricity), he discovered Corinthian’s charred body tied to a chair. He returned to his mother’s house, and they contacted the police. Defendant waived his rights and gave statements at approximately 1:10 p.m. and 3:40 p.m. on July 2, 2006. Defendant provided a blood sample, and was tested for drugs and alcohol at approximately 6:25 p.m. on July 2, 2006.

DISCUSSION

Part 1: Alleged Potential Conflict of Interest

Defendant’s primary argument on appeal, and the sole error advanced at oral argument, is that one of his two appointed trial attorneys, Daryl Gold, labored under a potential conflict of interest in that counsel himself was facing possible charges in an unrelated criminal offense at the time of defendant’s trial — charges pthat would be prosecuted by the Louisiana Attorney General’s Office. Defendant does not allege any specific actions counsel took or failed to take as a result of the potential conflict of interest; instead, he contends the risk of a potential conflict was great, such that the trial court inadequately inquired into the conflict and failed to obtain a valid waiver of conflicted counsel pursuant to State v. Cisco, 01-2732 (La.12/3/03), 861 So.2d 118.[2] He thus asserts the trial court’s failure violated his Sixth Amendment right to counsel and necessitates either reversal of the conviction and sentence or, alternatively, a remand for a hearing to determine whether the defendant’s waiver of the potential conflict of interest was knowing and intelligent. As discussed below, we find no merit to this assignment of error, because we conclude there has been no showing of an actual conflict of interest that necessitated either counsel’s disqualification or a waiver of conflicted counsel by the defendant. Accordingly, the trial court’s actions did not deprive the defendant of his Sixth Amendment right to conflict-free counsel.
The United States Supreme Court and this court have thoroughly examined the relationship between conflicting interests and effective assistance of counsel. See Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); State v. Wille, 595 So.2d 1149, 1153 (La.1992); State v. Carmouche, 508 So.2d 792, 797 (La.1987); State v. Edwards, 430 So.2d 60, 62-63 (La.1983); State v. Marshall, 414 So.2d 684, 687-88 (La.1982). The issue of conflicting loyalties usually arises in the *509 context of joint representation, but it can also arise in other scenarios. For example, an attorney may run into a conflict when “he or she is required to cross-examine a witness who is testifying against the defendant and who was or is a client of the attorney.” State v. Cisco, 01-2732, p. 17, 861 So.2d at 129-30 (quoting State v. Tart, 93-0772, p. 19 (La.2/9/96), 672 So.2d 116, 125, and citing State v. Kirkpatrick, 443 So.2d 546, 552 (La.1983)). A potential conflict may also arise when counsel himself is under criminal investigation or has been charged with criminal conduct, especially if the suspected or alleged conduct is related to counsel’s representation of the defendant or the charges against counsel are being investigated or prosecuted by the same prosecutor who is trying counsel’s client. See, generally, Anne Bowen Poulin, Conflicts of Interest in Criminal Cases: Should the Prosecution Have a Duty to Disclose?, 47 Am.Crim. L.Rev. 1135, 1162-77 (2010).
In a pretrial context, regardless of how the conflict of interest issue arises, the trial court has two options to avoid a conflict of interest: appoint separate counsel or take adequate steps to ascertain whether the risk of a conflict of interest is too remote to warrant separate counsel. Cisco, p. 17, 861 So.2d at 129-30; Tart, pp. 19-20, 672 So.2d at 125 (relying on Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978)); State v. Edwards, 430 So.2d 60, 62 (La.1983); State v. Marshall, 414 So.2d 684, 687-88 (La.1982). Failure to do one or the other in a case in which an actual conflict exists requires reversal. Cisco, p. 17, 861 So.2d at 129-30 (relying on Holloway, 435 U.S. at 480, 98 S.Ct. at 1181, and State v. Carmouche, 508 So.2d 792, 805 (La.1987) (on reh’g)). As we stated in State v. Franklin, 400 So.2d 616, 620 (La.1981), “if an actual conflict exists, there is no need for a defendant to prove that he was also prejudiced thereby.” Because defendant has asserted only an unknowing and unintelligent waiver of conflict-free 17counsel, and not prejudice, we are called upon to determine whether an actual conflict of interest existed and, if so, whether the defendant knowingly and intelligently waived his right to conflict-free counsel.[3]
This court in State v. Kahey, 436 So.2d 475, 485 (La.1983), accepting the definition set forth in Zuck v. Alabama, 588 F.2d 436 (5th Cir.1979), cert. denied, 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979), defined an actual conflict of interest as follows:
If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interest of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to the other client.
See also Dane S. Ciolino, ed., Louisiana Rules of Professional Conduct, Rule 1.7 comment 3 (L.S.B.A.2001) (“As a general proposition, loyalty to a client prohibits undertaking representation directly adverse to that client without that client’s consent.”).
To show an actual conflict, a defendant must prove, through specific instances in the record, that his attorney was placed in a situation inherently conducive to divided loyalties. Tart, p. 19, 672 So.2d at 125. The burden of proving an “actual conflict of interest,” rather than a *510 “mere possibility of conflict,” rests upon the defendant. Franklin, 400 So.2d at 620. The inherent dilemma in conflict of interest situations stems from what counsel finds himself compelled to refrain from doing. Holloway v. Arkansas, 435 U.S. at 490, 98 S.Ct. 1173.
| ^Although the transcript of the suppression hearing does not so reflect, counsel was arrested at the Red River Parish courthouse after the conclusion of defendant’s July 16, 2008 hearing on his Motion to Suppress. The trial court, clearly recognizing the possibility either of a potential conflict of interest or of an adverse effect on counsel’s performance as a result of the arrest, addressed the “incident” during a pretrial hearing on August 14, 2008. There is no indication in the record either of the precise basis for counsel’s arrest or of the possible charges against counsel to be investigated by the Caddo Parish Grand Jury; however, counsel explained to the trial court:
... I’ll go ahead and just state it for the record. I believe it was on July 16. Was that the last time we were in court? Based upon a complaint filed by my ex-wife with the Caddo Parish Sheriffs department I was arrested. And I think that’s probably a concern as to whether or not I can keep my mind on this trial or whether or not I’m going to be thinking about my situation. The Caddo Parish District Attorney’s office recused itself. It’s in the hands of the Attorney General’s Office, and the earliest they’re going to do anything, if they do anything, is have a Grand Jury on October 14, to decide whether or not there will be an indictment. And, if that Grand Jury is impaneled on October 14, I’m going to testify. So, I can tell you I have no problem keeping my mind on this case. But, you know what, to keep the record clear, you probably need to ask Mr. Carter if he’s got a problem with it. I’m just thinking that could come back to bite everybody later.
The trial court then questioned the defendant, who indicated that he had heard what counsel said and that he did not have any concerns or issues regarding counsel being able to represent him adequately. Defendant further indicated to the court that he did not have any questions for counsel and that he wished for counsel to continue with his representation.
Similarly, co-counsel Elton Richey stated he had seen no indication counsel was suffering from undue pressure that would impede his ability to concentrate on | ^defendant’s case, but that he, Richey, would remain “on the watch out for that,” and that “at present I think he’s doing just fine and he’s able to focus on the case with me and discuss the case with me and work with the team and the client. But these things change and develop and whatever, I don’t know.... And if at some point in time, I just want the Court to know that— You’re asking me and if that changes I’ll let you know.” Cliff Strider, representing the State, related that up to that point in the proceedings counsel had appeared thoroughly familiar with the proceedings and that he had observed no adverse affect on counsel’s representation of defendant. The trial court also observed that counsel’s representation had been “of the highest quality.” On that basis, the trial court determined there was no need either for a continuance of trial or for a request for substitute counsel. In effect, then, the court found neither an actual conflict of interest nor circumstances that would impair counsel’s representation of the defendant.
We find no error in the trial court’s determination that separate counsel was not required under these circumstances. Although we agree that a potential conflict of interest could arise where the district attorney’s office prosecuting *511 counsel’s client is simultaneously investigating or prosecuting counsel, this is not such a situation.[4] Here, the Caddo Parish District Attorney’s office, which had initially investigated the matter involving counsel, recused itself from investigating or prosecuting counsel, and the Louisiana Attorney General’s Office had taken over those duties. The District Attorney for |10Red River Parish was the investigator and prosecutor for defendant’s murder charge. Although the defendant argues the Attorney General oversees the district attorneys, including the District Attorney for Red River Parish, the office prosecuting defendant, any potential conflict of interest remains only that, a potential one, as there was no showing the Attorney General’s office had any direct or indirect role in the actual prosecution of defendant on the Red River Parish murder charge. In this case, counsel was under investigation by a different prosecutor and the pending charges against counsel were not related in any way to the murder charge against the defendant or counsel’s representation of the defendant; therefore, the risk of a potential conflict of interest was greatly attenuated. See Poulin, 47 Am. Crim. L.Rev. 1162-77; see also State v. Wille, 559 So.2d 1321 (La.1990), appeal after remand, 595 So.2d 1149 (La.1992)(al-though counsel had been convicted of a federal felony and represented defendant as part of community service condition on his suspended sentence, no actual conflict existed and defendant suffered no specific prejudice). The trial court here made sufficient inquiry into the matter and, from our review of the record, reasonably concluded that separate counsel was not required in this case; therefore, the trial court took “adequate steps to ascertain whether the risk of a conflict of interest [was] too remote to warrant separate counsel.” Tart, 93-0772 at 19-20, 672 So.2d at 125. Defendant has failed to demonstrate that his counsel labored under an actual conflict of interest, and thus no specific waiver of conflicted counsel was required.[5]

\-uPart 2: Alleged introduction of investigating officer’s personal opinion of defendant’s credibility

Defendant next argues the trial court erred in permitting the state to read de *512 fendant’s statement into evidence because the statements included annotations by the transcribing officer that communicated the officer’s impressions of defendant’s veracity. Specifically, he claims Deputy Sidney Jacobs typed the following lines into the transcript of the interview with defendant, which the judge permitted the jury to hear and see, thereby permitting a witness to comment on the credibility of the defendant who testified on his own behalf:
J.T. Lying about the last time see saw [sic] Corinthian, (eyes)
Telling the truth, more or less, about the last time he saw the mother, (eyes)
Defendant also claims the court erred in admitting the transcript because it contains notations describing defendant’s body language during the statement. Defendant posits that these notations constitute inadmissible “pop psychology”:
SJ What day was it, do you know? The last time you saw Corinthian, what day was it?
T (Eyes up and to the left) I don’t know.
SJ What do you know about the fact that Corinthian is dead?
T (eyes up and to the left.) (micro-expression)
At trial, the defense objected when the state entered a written copy of defendant’s statement into the record during Detective Johnny Taylor’s testimony. |12The defense objected on the grounds the statement was neither written by the defendant nor recorded, but rather it was a non-verbatim summary of the conversation between detectives and the defendant, including the observations of the detective who typed it, and because the typist was not present to authenticate the document. As a result, Deputy Jacobs, who typed the transcript, was called in to authenticate the document. Later, when Jacobs returned to testify about the statement, the defense objected to his explanation of the comments on defendant’s eye movements on the grounds that Jacobs lacked formal training and the comments merely constituted Jacobs’s personal observations and opinion on defendant’s truthfulness. The defense also objected on the grounds that credibility determinations are questions for the factfinder.
After Jacobs authenticated the statement, Detective Taylor was called back to the stand and testified in pertinent part that he did not know what the comments about defendant’s eyes or the term “micro-expression” meant. Taylor did not testify in any way regarding defendant’s credibility. After Taylor’s testimony, Deputy Jacobs was called back in to testify. He explained that the comments about defendant’s eye movements and the term “micro-expression” were his observations of defendant during the interview, and he noted them down while typing the transcript because he did not want to interrupt the transcript to note them elsewhere. He stated that the comments were his personal observations, that he had no formal training, and that the jury should not infer anything from his notes. At no point did Jacobs testify that the comments about defendant’s eye movements or the term “micro-expression” related to defendant’s credibility.
Despite defendant’s claim, Deputy Jacobs’s comment that defendant was lying in his statement was otherwise admissible as an opinion rationally based on 113Jacobs’s first-hand perceptions. La.C.E. art. 701; State v. Moses, 367 So.2d 800, 805-06 (La.1979)(officer’s opinion as to whether witness’s answers were responsive, whether statement seemed sincere, and whether statement sounded made-up *513 were admissible common sense inferences based on observation and experience); State v. Myers, 02-1296, pp. 8-10 (La.App. 3 Cir. 3/5/03), 839 So.2d 1183, 1189-90 (officer’s opinion that defendant’s statement was “bogus” admissible when not a comment on defendant’s guilt); State v. Debrow, 34,161, pp. 12-13 (La.App. 2 Cir. 3/2/01), 781 So.2d 853, 863 (officer’s opinion testimony admissible where based on experience as law enforcement officers and given in direct response to defense attempts to attack credibility).
The notes regarding defendant’s eye movements and “micro-expression” do not, in our view, constitute a comment on defendant’s credibility, because nowhere in the statement or trial testimony did Jacobs or Taylor interpret those notes as having any particular meaning. There was nothing to indicate to the jury that those notes were anything other than descriptions of defendant’s behavior during the interview, like other notes Jacobs included, such as, “(eyes slowly closing, shakes head side to side)” and “(shaking head side to side).” Accordingly, we find no merit to this assignment of error.[6]

Part 3: Defendant’s Motion for New Trial

114Pefendant raises several intertwined claims relating to the hearing on his motion for new trial. We will initially address the defendant’s arguments that the trial court should have appointed a sanity commission before allowing the defendant to withdraw the motion for new trial, that his withdrawal of the motion for new trial was invalid and denied him due process, and that his counsel was permitted to violate the attorney/client privilege when he testified at the motion for new trial. In addition, we will address the merits of several issues raised in the motion for new trial. The remaining issues related to the motion for new trial are addressed in the unpublished appendix. For the reasons that follow, we find no reversible error in the trial court’s rulings with regard to the motion for new trial and the defendant’s withdrawal of that motion.
On February 2, 2009, the defense filed a motion captioned as a Motion to Upset Court Date And Motion For New Trial And Motion To Bar Imposition of The Death Penalty On The Basis Of Defendant’s Incurable Mental Disorder and a Supplemental Motion for New Trial. As grounds for his motion for new trial, defendant alleged that the verdicts of guilt and death were contrary to the law and the evidence; rulings of the court show prejudicial error; trial was undermined by errors or defects not known to the defense before the verdict; new and material evidence, not previously available despite due diligence, was discovered since trial and would probably have changed the verdicts; *514 and that the ends of justice would be served by ordering a new trial.
In the accompanying brief, defendant claimed the verdict was contrary to the law and evidence and that the interest of justice allowed for a new trial even in the absence of strict legal right in that “Counsel has been investigating the testimony of Dr. [Richard] Williams” regarding the effects of defendant’s ingestion of | )sGeodon and alcohol and “expects to be able to offer expert testimony at the hearing on this motion that will establish that [Dr. Williams’s trial testimony was] incorrect and misleading to the jury,” and that “[b]ut for this highly prejudicial testimony, there is a reasonable probability that the jury would have returned a verdict of not guilty based on the finding of voluntary intoxication at the time of the offense in the guilt-innocence phase of trial, or a verdict of life during the penalty phase.”
Defendant next claimed the verdict was contrary to the law and evidence regarding insanity. He asserted Dr. Williams erroneously testified at trial that narcissistic personality disorder is a “mental disorder” rather than a “mental disease or defect” within the meaning of the law, and that, because this testimony was presented in rebuttal, the defense had no opportunity to correct the testimony.
Defendant also alleged that a new trial was warranted because his trial was infected with prejudicial error.[7] Finally, defendant alleged that an error or defect not known before the verdict, as well as the ends of justice, required a new trial, because the state’s failure to disclose the recording of a phone call between defendant and police officers until voir dire prejudiced the defense. In his Supplemental Motion for New Trial and Incorporated Memorandum, defendant alleged that a voice in the background of the phone call between defendant and police was defendant’s mother, rather than the victim, as the state alleged at trial. The defense sought to introduce new expert testimony to support these contentions, |,(-.claiming that the experts’ testimony regarding voice identification was “newly available and would likely result in a different verdict at trial.”
The trial court conducted a hearing on the motion on March 18, 2009. The defense called trial co-counsel Daryl Gold to testify regarding the timing of circumstances surrounding the state’s claimed late delivery of the recording of defendant’s phone call with police. On cross-examination, the state additionally questioned Gold about defendant’s claims regarding Dr. Williams, to establish whether the claims were based on newly discovered evidence and whether Dr. Williams’s testimony at trial constituted a surprise to the defense.
Gold testified that in preparation for trial the defense retained Dr. George Seiden and Dr. Mark Vigen to conduct psychological examinations of defendant. While Gold did not disclose the results of Dr. Seiden’s examination, the resulting report from Dr. Vigen indicated that defendant has Narcissistic Personality Disorder and *515 that he was not insane at the time of the offense. Gold further testified that, although Dr. Vigen was present during Dr. Williams’s testimony and “disagreed with Dr. Williams,” the defense did not call Dr. Vigen to testify in re-rebuttal because Dr. Vigen ultimately would have testified that defendant “was not incapable of distinguishing right from wrong at the time of the offense.”
Mid-way through the hearing, defendant interrupted counsel and informed him that he wished to withdraw the motion for a new trial. His counsel objected on the grounds that the decision to do so was not within defendant’s control. The trial court deferred ruling on defendant’s request in order to research the issue. However, the trial court permitted the continued examination of Gold, defendant’s trial counsel, to be considered a proffer of evidence should the Motion for new trial be withdrawn.
|,7At the conclusion of the testimony regarding whether Dr. Williams’s testimony was, in fact, newly discovered, the court found that the defense had had notice of the contents of Dr. Williams’s testimony before trial and granted the state’s earlier motion to dismiss defendant’s motion for new trial as to defendant’s two claims regarding Dr. Williams’s testimony, both as to narcissistic personality disorder and as to Geodon, and reserved defendant’s rights regarding his voice identification claim.
The court then conducted an extensive hearing regarding the expert qualification of Dr. Al Yonovitz and the admissibility of his techniques under Daubert.[8] The defense sought to introduce Dr. Yono-vitz as an expert in voice identification to testify that the voice heard in the background of the recorded phone call was not the victim’s. Ultimately, the trial court determined that Yonovitz’s techniques did not meet Daubert standards and denied his expert qualification.
The defense sought writs on the issues of whether the trial court erred in finding that defendant had waived his attorney/client and work product privileges and permitting trial co-counsel Daryl Gold to testify at the motion for new trial hearing, whether the trial court erred in granting the state’s motion to dismiss the claims arising from Dr. Richard Williams, and whether the trial court erred in excluding Dr. Yonovitz’s testimony as failing to meet Daubert standards.[9] The Second Circuit Court of Appeal granted writs and remanded to the trial court to |¶ ¡/‘conduct whatever proceedings it deems necessary and to issue a ruling on the applicant’s request to withdraw his motion for a new trial” including a determination that defendant had the capacity and desire to withdraw the motion for new trial. State v. Carter, 44,660 (La.App. 2 Cir. 9/24/09). The appellate court deferred ruling on the remaining issues pending resolution of defendant’s request.
On October 6, 2009, the defense filed a Motion to Determine Defendant’s Present *516 Capacity to Proceed, alleging that: “In preparation for this hearing counsel has communicated with the Defendant and discussed the proceedings. As a result of this conversation Counsel alleges on information and belief that the Defendant Terrance Carter does not presently have the mental capacity to proceed.”
That same day, the trial court addressed the defense’s motion to determine defendant’s capacity to proceed to evaluate his request to withdraw his motion for new trial. The court conducted an interview with defendant, establishing that he graduated high school, or at least obtained a G.E.D., that he could read and write, and asked defendant whether he still wished to withdraw his motion for new trial. Defendant replied:
Talking to my attorneys they said that if I withdraw the motion for new trial that I will abandon all rights to argue those issues they’re arguing now in future appeals. And if that’s true then I feel like it’s a tough decision on my part, because I feel like neither one of them actually fighting for my best interest. So, to try to take they counsel and try to decide this — I feel like the motion that Elton Ritchey written up wasn’t a motion that I feel that was for my best interest. I understand everything that’s going on. I’m not incompetent, but I cannot lie; I don’t I can’t confide in them. So, if I got — If they feel like I’m incompetent because — .
The judge interrupted defendant to seek a more direct response as to whether defendant still wished to withdraw his motion for new trial. He asked if defendant 119was being pressured to withdraw the motion; defendant replied that he was not. Defendant affirmed that he understood that if the motion succeeded, then theoretically he could obtain a new trial, that he had an automatic right to appeal, that he had read the motion for new trial and understood it, that he was giving up rights by withdrawing the motion, and, finally, clearly and unequivocally stated, “I wish to withdraw.”
On examination by defense counsel, defendant stated:
I was saying the motion for the new trial was never in my best interest. But, to make a decision to continue to go based on advice of my old counsel, I cannot do it; that’s what I’m saying. If I have to forfeit arguments in order — If I got to forfeit arguments if I drop the motion, it’s a tough decision. I feel like the arguments that Daryl Gold and them especially, Daryl Gold and them arguing — Daryl Gold get on the stand just his self was more damaging and hurtful on my behalf than anything, so that’s the reason I requested the motion for new trial, to withdraw the motion for new trial.
Defendant explained that he believed Gold’s testimony was damaging because, he believed, Gold expressed his opinion of defendant’s guilt. He further stated that he believed Richey was not acting in his best interest because of the expert witnesses he called during trial and at the motion for new trial, and that he did not trust the advice of any of his attorneys. Upon further questioning by defense counsel Gold and prosecutor Strider, defendant explained that:
Defendant: If I have to be honest, I feel like Dr. Seiden, Dr. Williams’ report— See I don’t know if I’m incriminating myself, hurting myself or not, that’s the reason I’m saying, because it wasn’t no surprise. Neither motion, neither topic that you all filing for on my behalf is a surprise. During trial I asked you all to argue it, but you all refused to. You all allowed to ride right through; you all didn’t stop the *517 trial or nothing. When the tape was presented I asked you to ask Alice Young, who was the woman on the 9-1-1 tape, was that Corinthian voice. You just ignored me in trial. So—
|2nGold: Keep going. Whatever you want to say.
Defendant: How can I — How can I trust advice of counsel that knew these issues in trial but ignored it; didn’t stop the trial to argue it. So—
Defendant: I feel like the reason I want to withdraw the motion for new trial, Elton Richey wrote the motions, and Elton Richey’s motions, most of the motions that Elton Richey write he express his bias opinion as you want to say, senseless murder or immodolation (SPELLED PHONETICALLY) [sic] [immolation], so — And that’s supposed to be an attorney on my behalf when he express without doing no thorough investigation and see if it was either or. It was just is when he received the case to me, so. No, I don’t think you all are acting on my best interest and that’s the reason why I desire to withdraw the motion for new trial. We can’t....
Gold: You’re saying that Mr. Richey, in his motion that was prepared, showed his prejudice?
Defendant: Some of his wording he say, it’s his feeling. He feel like the death was a victim that was sacrificed, a burned sacrifice. That what immodo-lation [sic] [immolation] mean; it’s a senseless killing, that mean ... That’s something I expect a District Attorney to write in their motion, but not attorney that’s for my behalf to write in their motion, expressing their opinions, their views on it.
Gold: Do you understand that when a motion is filed that’s not evidence, that’s just a—
Defendant: But still that’s something that I feel like the judge have to read across. And if the judge have to read it and see, the opinion or the view of the attorney that written it, I feel like that have some type of effect on the judge ruling or opinion. That’s how I feel.
Gold: Judge, I think that’s all the questions I have.
Strider: Very briefly, Judge. Mr. Carter, I just have a couple of questions. Did I understand you to say that the issues that were raised in the motion for new trial were not, was not new evidence that you had discussed—
Defendant: That’s what I’m talking about. I’m hurting myself more than really actually helping myself.
Strider: Okay. I don’t have any questions, Judge. Mr. Carter, that’s fair enough. You’re right. We have no questions.
121The court thereafter asked the defendant what he wanted to do on his motion for new trial. Defendant stated “ “I withdraw it, Judge.” The court then explained: “Okay. Based on the statements made by Mr. Carter, the way they were made, questions that were asked, I feel like Mr. Carter definitely has the capacity and understands what’s going on with regard to the motion for new trial and allow him to withdraw that motion at this time.”

A. Denial of the defense motion to appoint a sanity commission before defendant waived his motion for new trial

Defendant claims the trial court erred in permitting the withdrawal of his motion for new trial without first appointing a sanity commission to determine defen *518 dant’s competence after defense counsel filed a Motion to Determine Defendant’s Present Capacity to Proceed. We find no merit to his claim.
Under La.C.Cr.P. art. 643, the court must appoint a sanity commission only “when it has reasonable grounds to doubt the defendant’s mental capacity to proceed.” A defendant lacks the mental capacity to proceed when, due to a mental disease or defect, he lacks the capacity to understand the proceedings against him or assist in his defense. La.C.Cr.P. art. 641. The fact that a defendant calls his capacity to proceed into question does not for that reason alone require the trial court to order a mental examination. State v. Cyriak, 96-0661, p. 8-9 (La.App. 3d Cir.11/6/96), 684 So.2d 42, 47. Thus, the appointment of a sanity commission to inquire into the mental condition of the accused is addressed to the sound discretion of trial judge, and a reviewing court will not disturb the judge’s ruling absent a showing of abuse of discretion. State v. Wilkerson, 403 So.2d 652, 658 (La.1981); State v. Lott, 574 So.2d 417, 424 (La.App. 2d Cir.1991); State v. addler, 538 So.2d 1073 (La.App. 3d Cir.1989). Given the presumption of sanity in Louisiana jurisprudence, a defendant has the burden to establish his incapacity to stand trial by a clear preponderance of the evidence. La. R.S. 15:432; Cooper v. Oklahoma, 517 U.S. 348, 368-69, 116 S.Ct. 1373, 1384, 134 L.Ed.2d 498 (1996); State v. Frank, 96-1136 (La.10/4/96), 679 So.2d 1365.
Here, defendant has not shown the existence of any mental disease or defect that could diminish his capacity to understand the proceedings against him or assist in his defense. As demonstrated above, defendant’s answers during the court’s examination were articulate, cogent, and indicated that he fully comprehended the rights he was foregoing, the issues presented in his motion for new trial (including an accurate assessment of the merits of the arguments), how the withdrawal and motion related to the trial and appeal process, and the gravity of withdrawing the motion. Because the court’s interview established that defendant clearly had the capacity to understand the proceedings against him and to assist in his defense, and that he demonstrably did, in fact, understand the proceedings against him, the trial court did not err in failing to appoint a sanity commission to determine defendant’s competence. La.C.Cr.P. art. 641.
Although appellate counsel cites State v. Bordelon, 07-0525 (La.10/16/09), 33 So.3d 842, in support of the proposition that appointment of a sanity commission is mandatory before acceptance of defendant’s withdrawal, that case addressed waiver of a capital defendant’s entire appeal. Here, defendant did not seek to waive his appeal, he sought only to withdraw a motion for new trial that he deemed both meritless (in agreement with the trial court, which dismissed two of his claims before the withdrawal and denied expert status to the defense witness regarding the third claim) and a danger to his appeal in that, he believed, defense | ^counsel was unnecessarily putting evidence on the record that could damage his future appellate claims. On the basis of this colloquy, we find the trial judge did not err in determining that defendant had the competence to withdraw his motion for new trial. Defendant clearly understood the nature of the proceedings against him, the gravity and ramifications of his decision, was aware of his rights and expressed clear reasons for his decision, and he had clearly consulted with counsel and weighed counsel’s advice. The trial judge did not err in failing to appoint a sanity *519 commission before defendant’s withdrawal of his motion for new trial.

B. Defendant’s withdrawal of his motion for new trial was invalid, and denied him due process

Defendant also claims that his waiver of his motion for new trial was invalid, and by permitting it, the trial court denied defendant his rights to due process and effective assistance of counsel. Specifically, the defense argues that the decision to withdraw a motion for new trial is a tactical decision to be made by counsel, and not within the authority of the defendant. The defense further argues that for defendant to make such a tactical decision, he must execute an unequivocal request to represent himself, and waive his right to counsel with a hearing pursuant to Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
Generally, a defendant represented by counsel is bound by the motions and strategic decisions filed by counsel. State v. Bodley, 394 So.2d 584, 593 (La.1981)(represented defendant bound by attorney’s decisions regarding trial tactics); United States v. Daniels, 572 F.2d 535 (5th Cir.1978)(represented defendant cannot personally insist on calling a particular witness, but rather “is bound by his attorney’s decisions during trial”); United States v. O’Looney, 544 F.2d 385 (9th Cir.1976) (represented defendant cannot question attorney’s strategic and tactical trial decisions); United States v. Conder, 423 F.2d 904 (6th Cir.1970) (represented | ^defendant cannot personally insist on arguing questions of admissibility at trial or making objections during government’s direct examination; such a rule is necessary to “maintain the orderly conduct of the jury trial”); see also W. LaFave & J. Israel, Criminal Procedure, § 11.5(f), p. 51 (1991). Similarly, “ ‘[w]hile an indigent defendant has a right to counsel as well as the opposite right to represent himself, he has no constitutional right to be both represented and representative.’ ” State v. Brown, 03-0897, pp. 28-31 (La.4/12/05), 907 So.2d 1, 21-24 (quoting Bodley, 394 So.2d at 593).
Nevertheless, a trial court has the discretion to allow a defendant to act as his own co-counsel. State v. Mathieu, 10-2421, p. 7 (La.7/1/11), 68 So.3d 1015, 1019 (citing United States v. Edwards, 101 F.3d 17, 19 (2nd Cir.1996)(“The decision to grant or deny ‘hybrid representation’ lies solely within the discretion of the trial court.”)). A trial court may require a defendant acting as co-counsel to conduct portions of the trial entirely in his own right, or may permit the defendant to act in tandem with counsel during cross-examination of witnesses and closing argument to the jury. Mathieu, p. 7, 68 So.3d at 1019 (citing Brown, 03-0897 at 32, 907 So.2d at 24 (after asserting his right of self-representation because he was dissatisfied with his defense team in the capital case, defendant solely conducted the cross-examination of some witnesses, participated in the defense cross-examination of other witnesses, and gave his own closing argument in addition to counsel’s closing remarks at the guilt stage)). Hybrid representation in which a defendant acts in tandem with counsel in questioning witnesses or in presenting closing argument does not implicate Faretta. Mathieu, p. 7, 68 So.3d at 1019 (citing United States v. Cromer, 389 F.3d 662, 683 (6th Cir.2004)(“Here, Cromer did not waive his right to counsel because he continued to receive substantial assistance from counsel, even while he was actually questioning the witness.”); and] United States v. Leggett, 81 F.3d 220, 222 (D.C.Cir.1996)(defendant “merely sought and received the court’s permission to supplement his coun *520 sel’s examination and argument.”)). However, to the extent that hybrid representation in which defendant and counsel “act, in effect, as co-counsel, with each speaking for the defense during different phases of the trial,” results partially in pro se representation, “allowing it without a proper Faretta inquiry can create constitutional difficulties.” Mathieu, p. 8, 68 So.3d at 1020 (quoting 3 LaFave, Criminal Procedure, § 11.5(g), pp. 765-67).
Should a defendant wish to waive counsel and represent himself, “[t]he determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.” Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); see also State v. Strain, 585 So.2d 540, 542 (La.1991) (trial courts should inquire into the accused’s age, education, and mental condition in deciding, on a totality of the circumstances, whether accused understands significance of waiver). Further, a defendant must be made aware of the dangers and disadvantages of self-representation so that the record demonstrates that “ ‘he knows what he is doing and his choice is made with his eyes open.’ ” Faretta, 422 U.S. at 835, 95 S.Ct. at 2541 (quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942)). A defendant, in other words, must know the consequences of his action. City of Monroe v. Wyrick, 393 So.2d 1273, 1275 (La.1981). The assertion of the right must also be clear and unequivocal. See Faretta, 422 U.S. at 835, 95 S.Ct. at 2541; see also State v. Hegwood, 345 So.2d 1179, 1181-82 (La.1977).
12f;Here, defendant did not express any desire to waive his right to counsel and to represent himself as in a Faretta situation, or even to serve fully as co-counsel, but rather, he sought only to withdraw a single post-trial motion that counsel wished to pursue. With the exception of his request to withdraw the motion for new trial, defendant relied entirely on counsel’s representation; therefore, we do not consider this to be a hybrid representation situation in which defendant acted as co-counsel. Compare Mathieu, supra (defendant was permitted to conduct cross-examination of state witnesses).
Nonetheless, because the trial court has the discretion to permit hybrid representation, defendant has established no error in the court’s decision to allow him to withdraw the motion for new trial filed by counsel. Even were we to assume waiver of the right to counsel was required for defendant to withdraw his motion for new trial over counsel’s objection, the trial court’s inquiry regarding his competence and understanding of the motion and its consequences was sufficient for waiver of his right to counsel for Faretta purposes. Nothing in the record suggests that defendant was not capable of making that choice knowingly and voluntarily, because the trial court had ascertained defendant was literate, competent, and understanding. Mathieu, p. 13, 68 So.3d at 1022; Faretta, 422 U.S. at 835, 95 S.Ct. at 2541. Accordingly, the record establishes that defendant made a valid, knowing, and voluntary withdrawal of the motion for new trial. The trial court did not err in accepting defendant’s withdrawal.

C. Trial counsel’s testimony violated attorney/client privilege

Defendant next argues that during the hearing on the new trial motion, co-counsel Gold testified about privileged and work-product protected communications without first obtaining a valid waiver from defendant, and that the 127trial court erroneously *521 ruled the testimony was admissible because it was relevant to the state’s case.[10] In his brief, defendant does not specify the testimony that he claims was privileged or work product, although presumably he is referring to counsel’s testimony regarding consultation with Dr. Vigen and Dr. Seiden and the decision not to call them to testify at trial.
As an initial matter, although the defense objected to Gold’s testimony numerous times on the grounds that it was not relevant and beyond the scope of the issues raised in the motion for new trial, the defense did not register an objection to the testimony on the grounds that it was privileged. Only after the conclusion of the testimony and after defendant requested that his motion for new trial be withdrawn, upon returning from a consultation with defendant on his request to withdraw the motion, did counsel address the court as follows, “I would at this time, your honor, to move strike [sic] the testimony that the court has previously allowed over my objections with respect to Mr. Gold’s communications with Dr. Seiden and with Dr. Vigen, who were experts retained to consult in this matter. They’re — His communications with them do not — First off they would be protected and privileged as work product. The state would not otherwise be entitled to those or to a decision as to why we called particular witnesses or not with respect to the issue that’s before the court.”
Thus, defendant’s failure to raise a contemporaneous objection on the grounds that Gold’s testimony was privileged or work product precludes appellate review of the instant claim. La.C.Cr.P. art. 841. Additionally, a new basis for | ^objection cannot be raised for the first time on appeal. State v. Sims, 426 So.2d 148, 155 (La.1983); State v. Stoltz, 358 So.2d 1249, 1250 (La.1978); State v. Ferguson, 358 So.2d 1214, 1220 (La.1978). Finally, a “motion to strike” does not exist in Louisiana; once a witness has testified, his testimony cannot be removed from the record. A motion to strike cannot take the place of a proper objection. State v. Chaisson, 425 So.2d 745, 748 (La.1983); State v. Boyer, 406 So.2d 143, 148 (La.1981); State v. Kirsch, 363 So.2d 429, 431 (La.1978).
In any event, we find the trial court did not improperly admit any privileged testimony. The state’s questions to Gold did not involve confidential communications between defendant and his attorneys or between either defendant, his attorneys, or any representatives, and thus Gold’s answers to those questions are not protected by attorney-client privilege. La. C.E. art. 506. Likewise, by pleading not guilty by reason of insanity, a defendant places at issue all evidence regarding his mental condition and waives his right to doctor-patient privilege. State v. Berry, 324 So.2d 822, pp. 827-28 (La.1975). Dr. Vigen’s report not only appears to be admissible and discoverable, but the defense had in fact previously disclosed Dr. Vigen’s report to the state before trial, presumably in conjunction with the state’s discovery request that sought copies of all reports of physical and mental examinations conducted on defendant pursuant to La.C.Cr.P. arts. 724-726.
Finally, although both the state and the defense mentioned that Dr. Seiden had also examined defendant, Gold did not pro *522 vide any testimony regarding the results of the examination, nor did he testify as to the reason the defense chose not to call Dr. Seiden as a witness. Therefore, no privileged or protected information was disclosed regarding Dr. Seiden. Accordingly, we find no merit to defendant’s 129claim that privileged communications or work-product was improperly admitted in evidence.

D. Merits of the Motion for New Trial

Although we discern no error in the trial court’s acceptance of defendant’s request to withdraw the motion for new trial, we have also examined the motion’s underlying claims and find them to be without merit. As discussed in the appendix, defendant’s claims that the trial court erred in denying a second change of venue because defendant could not obtain a fair trial in Lincoln Parish, that the court erred in permitting the state to introduce juvenile adjudications, that the prosecutor misinformed the jury that mitigation is limited to “justification of the offending conduct and must be sufficient to “justify” adjusting the sentence down from death to life, and that the court erred in denying defendant’s testimony regarding his rejection of negotiations for a plea to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, are all without merit. Defendant’s remaining claims, as discussed below, are similarly meritless.

Expert testimony regarding voice identification

In his motion for new trial, defendant asserted the state erroneously posited at trial that the victim’s voice could be heard calling defendant’s name in the background of the phone call between defendant and police when, in fact, it was defendant’s mother. At trial, defendant presented an alternative explanation of the voice through his own testimony, in which he claimed the voice was his mother’s, rather than the victim’s. Despite defendant’s claims, this conflicting testimony was for the jury to assess in its role as the finder of fact in the case. The jury heard the recording, listened to both explanations, and came to its own conclusion about whose voice could be heard calling defendant’s name. The trier of fact evaluates Isftthe evidence and makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the “fact finder’s discretion only to the extent necessary to guarantee the fundamental due process of law.” State v. Mussall, 523 So.2d 1305, 1310 (La.1988).
In his motion for a new trial, defendant sought to introduce “newly discovered” expert voice identification to support his position at trial that the voice belonged to his mother, rather than the victim. Although the defense desires to introduce additional testimony on the subject, seeking out new expert witnesses after the conclusion of trial to counter evidence and testimony properly presented at trial does not qualify as “new and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial.” Notably, defense counsel Gold testified at the motion for new trial hearing that he believed he should have asked for a recess to obtain an expert in voice identification to perform an analysis on the recording; he could provide no reason for his failure to do so, merely stating, “I just didn’t.”
Additionally, defendant does not show that “if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty,” because the record evidence overwhelmingly supports the jury’s determina *523 tion that defendant abducted the victim and held him in an abandoned house for a period of time before killing him, including during the time period that he spoke with the police officers. La.C.Cr.P. art. 851. Even assuming that the voice is defendant’s mother’s, as defendant argues, the jury was clearly not misled into erroneously believing that defendant had had the victim in his custody, and the recording is merely cumulative of other testimony. In terms of the penalty phase, |S1 while a recording of the victim calling out to the defendant within minutes of his death no doubt had an emotional impact on jurors, proving that the recording in fact captured only the voice of defendant’s mother would scarcely have diminished the stark reality underscored by the other evidence in this case that defendant had tied a five-year-old child to a chair and burned him alive. Accordingly, we find no basis for the granting of a new trial on this ground.

New expert testimony regarding the effects of Geodon and defendant’s intoxication defense, and new expert testimony regarding whether narcissistic personality disorder is a mental disease or defect.

At trial, the defense called two experts, Dr. Angela Springfield and Dr. Gary Booker, to testify regarding defendant’s blood levels of Geodon and the possible intoxicating effects thereof. The state called Dr. Williams as an expert, who testified on the same subject, as well as on his examination of defendant for purposes of defendant’s insanity defense. As with defendant’s argument above, the conflict between the experts’ testimony on the effects of Geodon was for the trier of fact to assess in its role as the factfinder in the case. Questions of credibility are for the trier of fact, including the evaluation and resolution of conflicts in expert testimony. Lasyone v. Kansas City South. R.R., 00-2628, p. 13 (La.4/3/01), 786 So.2d 682, 693.
As to Dr. Williams’s claimed surprise testimony that narcissistic personality disorder is not a mental disease or defect, the state introduced a report prepared by Dr. Williams in advance of trial and transmitted to the defense on November 20, 2007, in which Dr. Williams concluded, among other things, that defendant had narcissistic personality disorder and that defendant did not have a mental disease or defect at the time of the offense that rendered him incapable of distinguishing right from wrong. Thus, although the report did not combine the two conclusions into a | ^single statement, the foundational elements of the conclusions were present in the report and logically could be deduced from reading it. Therefore, defendant has failed to show that Dr. Williams’s testimony came as a surprise to the defense.
Additionally, as with defendant’s claims above, although defendant may in hindsight wish to introduce additional expert testimony on the subject, seeking out new expert witnesses after the conclusion of trial to counter evidence and testimony presented there does not qualify as “new and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial.” As defense counsel Gold testified at the hearing on the motion for new trial hearing, the defense had consulted its own psychiatric experts, one of whom was present during Dr. Williams’s claimed erroneous trial testimony. Yet, the defense chose not to call them as witnesses because their testimony would not support defendant’s defense strategy. Thus, both defense counsel were not surprised by Dr. Williams’s testimony and had the opportunity at trial to present rebuttal witnesses, but counsel made a strategic election not to do so. These *524 claims are without merit and do not constitute grounds for a new trial.

Late disclosure of telephone call recording.

Defendant also argues he was prejudiced when the state, during voir dire and just four days before the start of trial, first disclosed to the defense the CD recording of the telephone conversation between a police officer and defendant. The state had explained that it had only just received the CD from the police department.
We find no prejudice and, thus, no reversible error under the circumstances. Not every violation of the discovery procedures requires reversal; before the | -¡^defendant may complain of the violation he must establish that prejudice resulted. State v. Hooks, 421 So.2d 880, 886 (La.1982); State v. Strickland, 398 So.2d 1062, 1067 (La.1981). When a defendant is lulled into a misapprehension of the strength of the state’s case through the prosecution’s failure to disclose timely or fully, and the defendant suffers prejudice when undisclosed evidence is used against him, basic unfairness results which constitutes reversible error. State v. Mitchell, 412 So.2d 1042, 1044 (La.1982); State v. Davis, 399 So.2d 1168, 1171 (La.1981). Regardless, discovery violations generally do not provide grounds for reversal of a conviction and sentence unless they have actually prejudiced the defendant; even a discovery violation involving the state’s failure to disclose exculpatory evidence does not require reversal as a matter of the Due Process Clause unless the nondisclosure was so serious that there exists a reasonable probability that the suppressed evidence would have produced a different verdict. State v. Garrick, 03-0137, p. 6 (La.4/14/04), 870 So.2d 990, 993.
The defendant must show here that the state’s untimely disclosure of the recorded telephone call deprived the defense of an opportunity to place before the jury all evidence relevant to the credibility of the witness’s testimony and thereby “ ‘undermines confidence in the outcome of trial.’ ” State v. Walter, 96-1702, p. 1 (La.6/20/97), 695 So.2d 1340 (quoting Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995)). Here, ultimately the CD contained no evidence not already known to the defense. It contained a recording of a telephone call made at 9:03 p.m. on July 1, 2006, between police officer Allison Young and defendant, in which defendant denied abducting the victim and denied having a green van. However, defendant, defendant’s mother, the victim’s mother (Pamela Fisher), and several officers, all testified that the police and Ms. Fisher spoke with defendant several times on July 1 in search of the victim, and that defendant | ^repeatedly denied knowledge of the victim’s whereabouts. Thus, the contents of the recording clearly did not constitute a surprise to the defense.
Defendant argues he was prejudiced because the state argued at trial that a voice heard in the background of the recording repeatedly calling defendant’s name belongs to the victim (as discussed above, defendant argued at trial that the voice is his mother’s; she can also be heard in the background of the recording). However, even assuming the voice is the victim’s, this recording did not constitute a surprise to the defense, and defendant has not shown that disclosure of the recording shortly before trial prejudiced his defense.
Because none of the claims raised in the motion for new trial has merit, based on our review of the record, defendant has not established any basis warranting the grant of a new trial. We thus find no reversible error with regard to the motion for new trial and defendant’s withdrawal of that motion.

*525
CAPITAL SENTENCE REVIEW

In the discharge of the duty imposed by the legislature to “review every sentence of death to determine if it is excessive,” La.C.Cr.P. art. 905.9, this Court reviews the record in a capital case to determine: (1) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors; (2) whether the evidence supports the jury’s finding of a statutory aggravating circumstance; and (3) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. La.S.Ct. Rule 28, § 1. In the present case, our review demonstrates that defendant’s death sentence is not unconstitutionally excessive.
lsSThe trial testimony, the Uniform Capital Sentence Report (“UCSR”) required by La.S.Ct.R. 28, § 3(a), and the Capital Sentence Investigation Report (“CSIR”) from the Department of Public Safety and Corrections, see La.S.Ct.R. 28, § 3(b), indicate that defendant, an African-American male, was born in Michigan on July 11,1979, and is a twin, with a total of seven brothers and sisters. His mother, who has been diagnosed as schizophrenic, separated from his father and moved back to Louisiana when defendant was approximately five years old. Defendant and his siblings remained in Michigan with his father until defendant, at around the age of thirteen, was sent to Louisiana live with his mother. After he began to get in trouble with the law, including juvenile charges for simple battery, simple burglary of an inhabited dwelling, and theft, as well as a suicide attempt, defendant was sent back to Michigan to live with his father.
Upon his return to Michigan, defendant completed his education through the 9th grade, after which he completed his GED. He is of average intelligence. Defendant has never been married and is the father of a son, born on December 15, 2005. Although he has not had a relationship with the child, trial testimony indicated that he had at some point established his paternity through DNA testing. Defendant worked primarily at menial jobs for short periods of time during his adult life, and had periods of homelessness and unemployment. While defendant has juvenile adjudications in his past, he has had no convictions as an adult prior the instant case. The record shows that at least two psychiatric evaluations were performed on defendant by defense experts Drs. Vigen and Seiden, and both determined that he could distinguish right from wrong and cooperate in his defense. The evaluations also found that defendant had depression, narcissistic personality disorder with borderline anti-social features, and alcohol dependence.

\zñPassion, Prejudice, or Other Arbitrary Factors

Defendant contends that seven factors introduced passion, prejudice, or other arbitrary factors into his trial: 1) three members of the jury were exposed to the inflammatory rhetoric of venireman Larry Clinton during jury selection; 2) gruesome photographs of the victim’s body aroused the jury’s passions and prejudice; 3) jurors were inflamed by their allegedly erroneous belief that the voice calling defendant’s name in the background of the phone call from police was the victim calling for help rather than defendant’s mother as defendant claims; 4) the court permitted the state to introduce inflammatory hearsay testimony when Officer Jessica Young testified regarding her phone call with defendant; 5) the state referred to defendant’s juvenile offenses during the penalty phase;[11] 6) the state presented *526 testimony that defendant was not intoxicated at the time of the offense; and 7) the state instructed jurors to disregard the testimony of defendant’s family. However, each of these claims has been fully addressed elsewhere in this opinion or its unpublished appendix and lacks merit.
Otherwise, the record does not establish any potential indicia of passion, prejudice, or arbitrariness. Defendant, an adult black male, killed a black male child. While the race of the jurors was not documented in the record of this case, no challenge was raised under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), during the jury selection process. Moreover, nothing in the record suggests race was an issue in the trial.
| ^Aggravating Circumstances
In this case, the jury found aggravated kidnapping,[12] second degree kidnapping,[13] aggravated arson,[14] and a victim under the age of twelve all to be aggravating factors supporting the death penalty. As demonstrated by the evidence presented and the jury’s verdict during the guilt phase of the trial, the state presented sufficient evidence to prove each aggravating circumstance beyond a reasonable doubt. The evidence is sufficient to establish that defendant abducted the five-year-old victim from his father’s home, took him to an abandoned house in a nearby town, and killed him by tying him to a chair with an extension cord, pouring gasoline over him, setting him on fire, and allowing him to burn to death. Thus, the state proved beyond a reasonable doubt the existence of the aggravating circumstances of second degree kidnapping, aggravated arson, and a victim under the age of 12 years. Although defendant contends the evidence was insufficient to support the aggravating factor of aggravated kidnapping, as discussed in the appendix, the evidence presented at trial demonstrates that factor beyond a reasonable doubt.

Proportionality

Although the federal Constitution does not require proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative | ^proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990); State v. Wille, 559 So.2d 1321, 1341 (La.1990); State v. Thompson, 516 So.2d 349, *527 357 (La.1987). This court, however, has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case, inter alia, a sufficiently “large number of persuasive mitigating factors.” State v. Sonnier, 380 So.2d 1, 9 (La.1979); see also State v. Weiland, 505 So.2d 702, 707-10 (La.1987) (in case reversed on other grounds, dictum suggesting that death penalty disproportionate).
This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury’s recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, 380 So.2d at 7.
The state’s Sentence Review Memorandum reveals that since 1976, in the Thirty-Ninth Judicial District Court, Red River Parish, only six people have been indicted for capital offenses. Of these, five have entered pleas of guilty and been sentenced to terms of imprisonment. Jurors have recommended imposition of the death penalty only once apart from the instant case. In that case, John Dale Allen was indicted for the first degree murder of Shirley P. (Elaine) Oliver, whom he stabbed to death. A jury found Allen guilty of first degree murder and recommended death, finding that Ms. Oliver was killed during the perpetration or attempted perpetration of an armed robbery. The trial court sentenced Allen to death on September 26, 2002. This court affirmed the conviction and sentence in State v. Allen, 03-2418 (La.6/29/05), 913 So.2d 788.
|aflIn face of the few capital sentences out of the Thirty-Ninth Judicial District Court, it is appropriate for this Court to look beyond the Thirty-Ninth JDC and conduct the proportionality review on a statewide basis. Cf. State v. Davis, 92-1623, pp. 34-35 (La.5/23/94), 637 So.2d 1012, 1030-31. A statewide review reflects that jurors have regularly recommended capital sentences in cases involving the murders of young children.
State v. Brogdon, 457 So.2d 616 (La.1984) (19-year-old defendant and a 17-year-old accomplice lured the 11-year-old victim into their car, drove her to an isolated spot, raped her repeatedly, forced oral sex, and then tortured her by beating her with a brick, shoving sharp objects into her vagina, and cutting her with a broken bottle). State v. Loyd, 489 So.2d 898 (La.1986) (25-year-old white defendant kidnapped a 3-year-old white female victim, raped her vaginally and anally, and drowned her in a ditch; death sentence vacated on ineffective assistance of counsel grounds, and eventually defendant received a sentence of life imprisonment); State v. Copeland, 530 So.2d 526 (La.1988), habeas granted, 556 So.2d 1250 (La.1990) (defendant and his co-defendant, George Brooks, repeatedly raped an 11-year-old boy and shot him several times); see also State v. Brooks, 505 So.2d 714, rev’d, 94-2438 (La.10/16/95), 661 So.2d 1333; State v. Deboue, 552 So.2d 355 (La.1989) (during the course of an aggravated burglary, defendant cut the throats of his 6-year-old and 11-year-old victims, allowing them to drown in their own blood); State v. Sepulvado, 93-2692 (La.4/8/96), 672 So.2d 158 (defendant, over a three-day period, tied a rope around his 6-year-old stepson’s neck, threatened to hang him, beat him, put his head in the toilet and flushed, refused to feed him, kicked him from one room to another, and, finally, put him in a tub of scalding water which produced third degree burns over sixty percent of the victim’s body); State v. Connolly, 96-1680 (La.7/01/97), 700 So.2d 810 (defendant Lncut the throat of his 9-year-old victim, *528 who was initially found alive in a pool of blood by his father, but died shortly after arriving at the hospital); State v. Langley, 95-1489 (La.4/14/98), 711 So.2d 651 (defendant choked a 6-year-old boy with his hands and then garroted the victim with nylon line and stuffed a dirty sock into the victim’s mouth; in subsequent re-trial, defendant was found guilty of second degree murder, State v. Langley, 10-0969 (La.App. 3d Cir.4/6/11), 61 So.3d 747, writ pending); State v. Deruise, 98-0541 (La.4/3/01), 802 So.2d 1224 (defendant shot and killed an eleven-month-old infant during an armed robbery); State v. Deal, 00-0434 (La.11/28/01), 802 So.2d 1254 (defendant killed his two-month-old son by sticking a paper towel down the child’s throat to cut off his airway, and when this did not succeed in stopping the child’s crying, the defendant picked the child up and threw him against the crib, fracturing his skull); State v. Reeves, 06-2419 (La.5/5/09), 11 So.3d 1031 (defendant abducted, sodomized, and killed the 4-year-old victim by stabbing her numerous times and cutting her throat).
While many of these cases also involve the rape of the victim or another enumerated felony, in light of the horrific circumstances in which defendant killed the five-year-old victim in this case, we do not find that a sentence of death is a disproportionate penalty.
DECREE
For the reasons assigned herein, the defendant’s conviction and death sentence are affirmed. This judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of |41 certiorari; or (b) that Court denies his petition for rehearing, the trial court shall, upon receiving notice from this court under La.C.Cr.P. art. 923 of finality of direct appeal, and before issuing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:147; and (2) to litigate expeditiously the claims raised in that application, if filed in the state courts.

. Despite the dual plea, defense counsel did not move for a sanity commission to determine either defendant's competency to stand trial or his mental status at the time of the offense.

. In Cisco, appointed defense counsel was necessarily confronted with an actual conflict of interest when she was required to cross-examine the State’s most important identity witness, whom she also represented in a contested family law matter, at the trial of the defendant. The witness was the lead detective in the investigation of the case who had taken some nineteen statements from the defendant, some of which were inculpatory, in a case in which there was no physical evidence linking the defendant to the crime. We found that, once alerted to the actual conflict of interest, the trial court failed to take adequate steps to protect the defendant's Sixth Amendment rights. We further found that the defendant's waiver of his right to conflict-free counsel was not knowing and intelligent, because the trial court failed to inform him adequately that a conflict of interest existed, the consequences to his defense from continuing with conflict-laden counsel, and he had a right to obtain other counsel.

. If a defendant does not raise the issue until after trial, he “must establish that an actual conflict of interest adversely affected his lawyer's performance.” Sullivan, 446 U.S. at 350-51, 100 S.Ct. at 1719. See also Wille, 595 So.2d at 1153.

. Defendant refers to Armienti v. United States, 234 F.3d 820 (2nd Cir.2000), in which the defendant there had "made a sufficient showing to require the district court to hold an evidentiary hearing to determine whether there was an actual conflict of interest and, if so, whether the conflict adversely affected his lawyer’s performance” in that, while representing the defendant, counsel was under criminal investigation by the same agency prosecuting his client. Armienti, 234 F.3d at 825.

. Defendant essentially argues there was a potential conflict of interest, or at least a great risk thereof, which in effect amounts to an argument that counsel may have rendered ineffective assistance of counsel. A claim for ineffective assistance of counsel is more properly raised in an application for post-conviction relief. State v. Peart, 621 So.2d 780, 787 (La.1993); State v. Burkhalter, 428 So.2d 449, 456 (La.1983). This forum enables the judge to conduct, if necessary, a full evidentiary hearing on the matter. State v. Seiss, 428 So.2d 444, 449 (La.1983). Under the standard for ineffective assistance of counsel set out in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), adopted by this court in State v. Washington, 491 So.2d 1337, 1339 (La.1986), a reviewing court must reverse a conviction if the defendant establishes: (1) that counsel’s performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel’s inadequate performance prejudiced defendant to the extent that the trial was rendered unfair and the verdict suspect. Because defendant has not asserted any specific claims that his counsel's performance was either inadequate or resulted in prejudice to his case, we need not address an ineffective assistance of counsel claim at this time.

. Even assuming the district court erred in admitting the remarks, any error was harmless on this record. An error is harmless beyond a reasonable doubt if it is unimportant in relation to the whole and the verdict rendered is surely unattributable to the error. Arizona v. Fulminante, 499 U.S. 279, 295-296, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991); Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); State v. Sanders, 93-0001, p. 25 (La.11/30/94), 648 So.2d 1272, 1291. Here, the record evidence demonstrates that defendant repeatedly and untruthfully told police that he had not abducted Corinthian, such that Jacobs’s note that defendant was "Lying about the last time see saw Corinthian” in defendant’s statement is clearly duplicative of voluminous other evidence, including defendant's own testimony at trial. Reviewing the record as a whole, we find that the verdict in the present case, where defendant admittedly abducted a young boy and burned him to death, is surely unattributable to the disputed comments in this statement. We conclude any possible error in admitting the statement along with the comments thereto was harmless.

. In addition to the claimed errors discussed here, defendant’s claims addressed in the appendix are that the trial court erred in denying a mistrial on the grounds that defendant could not obtain a fair trial in Lincoln Parish, that the court erred in permitting the state to introduce juvenile adjudications during the penalty phase, that the prosecutor misinformed the jury that mitigation is limited to "justification of the offending conduct and must be sufficient to "justify” adjusting the sentence down from death to life, and that the court erred in denying defendant’s testimony regarding his rejection of negotiations for a plea to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Under the standards set out in Daubert, which this Court adopted in State v. Foret, 628 So.2d 1116, 1121 (La.1993) (Louisiana’s La.C.E. art. 702 is "virtually identical to its source provision in the Federal Rules of Evidence ... [Rule] 702”), the trial court is required to perform a "gatekeeping” function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.” Daubert, 509 U.S. at 589, 113 S.Ct. at 2795.

. Defendant initially filed his application for writs in this Court, which transferred the application to the Second Circuit because the court of appeal retains jurisdiction over capital cases until a sentence of death is imposed. State v. Carter, 09-1154 (La.6/17/09), 10 So.3d 720.

. Although defendant claims the trial judge admitted the claimed privileged testimony because it was "relevant to the state's case against Mr. Carter,” the court more accurately admitted the testimony because it was relevant to the disposition of defendant’s claims in his motion for new trial.

. As discussed in the appendix, defendant argued in the instant appeal that the judge *526 erred in failing to grant the defense's motion for mistrial when the state elicited testimony regarding defendant’s juvenile adjudications during the guilt phase of trial. Here, he alleged that testimony regarding the adjudications during the penalty phase of trial injected passion, prejudice, or other arbitrary factors into his penalty phase. However, because the jury had already heard this testimony during the guilt phase, we do not find that the jury’s hearing the testimony again during the penalty phase would have affected its sentencing recommendation.

.R.S. 14:44 defines aggravated kidnapping as the seizing or carrying of a person from one place to another, either through force or enticement, "with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender’s actual or apparent control.”

. R.S. 14:44.1 defines second degree kidnapping in pertinent part as forcibly seizing or persuading a person to go from one place to another or imprisoning or forcibly secreting a person when the victim is physically injured.

. R.S. 14:51 defines aggravated arson as the intentional damaging by any explosive substance or the setting fire to any structure, watercraft, or moveable whereby it is foreseeable that human life might be endangered.