Judgment rendered August 28, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,747-KA
No. 55,748-KA
(Consolidated Cases)

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

CORTEZ DE'SHUN HINES                        Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court Nos. 394,960 & 370,018

Honorable Christopher T. Victory, Judge

* * * * *

LOUISIANA APPELLATE PROJECT            Counsel for Appellant
By: Edward K. Bauman

JAMES E. STEWART, SR.                   Counsel for Appellee
District Attorney

KODIE K. SMITH
VICTORIA T. WASHINGTON
MARGARET RICHIE GASKINS
Assistant District Attorneys

* * * * *

Before PITMAN, STEPHENS, and ELLENDER, JJ.

**ELLENDER, J.**

Cortez De'Shun Hines appeals his conviction of second degree murder arising from the shooting death of Sherman Rambo. We affirm.

## FACTUAL BACKGROUND

Shortly before 8:00 pm on September 1, 2019, the 42-year-old Rambo and his uncle Gregory Wells drove to the A1 Stop, a convenience store at the corner of Youree Drive and Stoner Avenue in Shreveport, to pick up some beer after a day's work. Rambo was driving a white Chevy Tahoe; he let Wells out of the truck and, after other vehicles cleared off, pulled up to the front door of the store. Interior surveillance video showed Wells and another patron, in a black shirt, inside the store. Suddenly a young Black man wearing a red shirt opened the door, entered briefly, glanced around, shouted something at somebody, and then turned around and hurried out the door. Wells then exited the store, apparently without buying anything, and got into the front passenger seat of the Tahoe.

About this time, someone in a red Chevy Cruze pulled up to the front of the store, facing the Tahoe, and the man in the black shirt exited the store. According to Wells, the man in the red shirt walked up to the Cruze, held up his hand and made a "finger gun" gesture toward the other man, and then reached inside the Cruze, pulled out an actual gun, and started firing at the other man. Seeing this develop right before his eyes, Wells slid out of the passenger seat and hid under the Tahoe.

The man in the black shirt, later identified as Shaquille Bradford, ducked behind the Tahoe to avoid getting hit. He hid behind the passenger side and edged toward the driver's side, but the gunman followed him with a

stream of shots. After a few shots struck the radiator and hood, another pierced the front glass, apparently striking Rambo. Wells and Bradford were unhurt. The gunman quit shooting, turned around, and fled on foot toward Stoner.

Exterior surveillance video showed that, after the shooter took off, the driver of the Cruze edged up alongside the Tahoe, fired a few more shots, and then pulled onto Stoner. Surveillance video from a nearby office-equipment business, C.F. Biggs, showed the red Cruze as it stopped, picked up the man in the red shirt, and drove west on Stoner, toward Stone Vista Apartments. Surveillance video from Stone Vista showed the red Cruze arriving, and two men walking down a fire alley.

Shreveport Police received the 911 call at 7:58 pm; Officer Ladarius Ford arrived moments later, to find Wells cradling the stricken Rambo. Ofc. Ford administered CPR and called EMS, but Rambo was declared dead at LSU Health Sciences Center, a bullet lodged near his spine. Wells told Ofc. Ford that the assailant, who was wearing a red shirt, had entered the store, exited, and then started firing. Officers looked around for anybody matching the description, but without success. Sgt. Jennifer White, a crime scene investigator, processed the scene, recovering four jacket fragments and 15 .40-cal. casings on the parking lot pavement. Later, after the Tahoe was impounded, officers found an additional .40-cal. bullet in the hood and two fragments lodged elsewhere in the truck.

The lead investigator on the case, Det. Donald Henry, drove Wells from A1 to the police station. En route, Wells told him he would be able to identify the shooter. Meanwhile, police received a Crime Stoppers tip that

2

the driver of the Cruze was Jacody Wilson, who stayed at Stone Vista Apartments. A resident of Stone Vista, Caroline Harris, told Det. Henry that Wilson and a relative of his, the defendant, 27-year-old Cortez Hines, had visited that day driving a red Cruze. Sgt. Jeff Brown used a SPD database to trace the Cruze to Alexis Gray, who lived on Lancaster Street, in the Sunset Acres area of Shreveport. Officers obtained a search warrant for that house.

Sgt. Brown and two other officers executed the warrant two days after the crime, on September 3. When they pulled up, they saw the red Cruze parked in the driveway; three Black men, Hines, Wilson, and Carl McClinton, were standing at the head of the driveway, close to the backyard; Alexis Gray was inside the house. All were taken in for questioning. Gray ultimately told officers that Wilson had used her car, the Cruze, to drop her off for work at Piccadilly Cafeteria around 11:00 am the day of the crime and picked her up about 8:30 pm. The Cruze had no damage, and she was unaware it had been involved in a shooting until officers came with the search warrant. The Cruze was dusted and swabbed but yielded no usable fingerprints or DNA.

Behind the house on Lancaster Street was a blue recycle bin with its lid open; in it, officers found two handguns: a black Glock Model 22 .40-cal., with one bullet in the chamber, and a blue Taurus 9 mm, with a loaded magazine. Inside the house, on a couch in the living room, they found a Glock Model 23 .40-cal. pistol. Forensic testing on these guns and on the casings taken from the A1 parking lot showed that nine of them had been fired from the Glock Model 22 and six from the Glock Model 23. The fragments were too deformed to be compared. The guns were dusted and swabbed but, like the car, yielded no usable fingerprints or DNA.

3

Inside the house, officers found four cellphones, including a blue iPhone X on top of a takeout box from Southern Classic Chicken. Officers obtained a search warrant for this phone, accessed its contents, and found three notable photos. One, taken on August 31, the day before the crime, was a shot of Hines holding the blue iPhone in a mirror and showing his reflection. Two, taken on September 1 at 5:31 pm, showed Hines wearing a red Champion® T-shirt. Officers did not recover that shirt, or any red shirt, when they searched the house.

After interviewing Hines, Wilson, and McClinton, Det. Henry got another officer, unconnected to the case, to assemble a six-photo lineup that included Hines's picture. Det. Henry then showed this lineup to Wells, who picked out Hines. Wells also identified Hines at trial.

## PROCEDURAL HISTORY

The state initially charged all three men, Hines, Wilson, and McClinton, with the second degree murder of Rambo (docket 55,748-KA). Hines pled not guilty. After discovery, the state moved to sever all charges; this was granted, and the remainder of the record (docket 55,747-KA) involves Hines only.

The case proceeded to jury trial over four days in April 2023. Eighteen witnesses testified, and evidence included five surveillance videos, 295 still photos, the three guns and various projectiles, forensics reports, the blue iPhone X, a copy of the photo lineup, and other items.

At trial, Det. Henry, Sgt. Brown, Sgt. White, and several other officers described their investigation of the case. The state's theory was that Hines was the man in the red shirt who pulled a gun out of the Cruze, tried to hit Bradford, but hit Rambo instead.

4

The witnesses generally agreed that the quality of the surveillance video, particularly the outdoor camera at A1, was not good enough to give a sharp impression, or positive identification, of the gunman's face. Wells testified he had never seen Hines before, and then saw him only briefly – first when he poked his head inside the store and, moments later, when he pulled a gun and forced Wells to take cover under the Tahoe. Still, he told Det. Henry that he could identify the shooter, and he picked Hines's picture out of the lineup and again identified him at trial. Defense counsel did not move to suppress the photo lineup or object to any of Wells's testimony.

On the third day of trial, Det. Henry testified about the contents of the blue iPhone X: the three photos of Hines, including two taken shortly before the crime showing him in a red Champion® shirt. Defense counsel vigorously objected to these photos, urging lack of foundation; however, after discussion out of the jury's presence, counsel conceded that he had filed no motion to suppress the contents of the phone, and suggested this failure might constitute ineffective assistance of counsel. Counsel withdrew the objection, and the photos were admitted.

At the close of evidence, the jury took 54 minutes to find Hines guilty as charged of second degree murder. The court later imposed the mandatory life sentence at hard labor and without benefits. This appeal followed.

## DISCUSSION

### *Sufficiency of the Evidence*

By his first assignment, Hines urges the evidence was insufficient to prove him guilty of second degree murder. He concedes the evidence must be viewed in "the light most favorable to the prosecution," *Jackson v.*

*Virginia*, 443 U.S. 307, 99 S. Ct. 2781 (1979), the appellate court cannot assess credibility or reweigh evidence, *State v. Stowe*, 93-2020 (La. 4/12/94), 635 So. 2d 168, and Louisiana recognizes the concept of transferred intent, *State v. Strogen*, 35,871 (La. App. 2 Cir. 4/3/02), 814 So. 2d 725, *writ denied*, 02-1513 (La. 12/13/02), 831 So. 2d 983.

He argues, however, that when the issue is identity of the defendant, the state must negate any reasonable probability of misidentification, *State v. Weary*, 03-3067 (La. 4/24/06), 931 So. 2d 297, *cert. denied*, 549 U.S. 1062, 127 S. Ct. 682 (2006). Further, courts use factors to assess the reliability of eyewitness identification, *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375 (1972); *State v. James*, 464 So. 2d 299 (La. 1985). He contends that Wells saw the shooter for "only a short period" as the individual walked into A1, turned back around, and left; outside, Wells quickly crawled under the Tahoe, which would "hinder anyone's view of the entire incident." In short, Wells had neither the opportunity to view the criminal at the time of the crime nor a good level of attention, thus failing the first two factors of *Neil v. Biggers*, *supra*. Hines also argues that the officer who actually assembled the photo lineup, a Det. Lozan, was not called to testify, so there is no assurance that the lineup met protocols for fairness.

Finally, he cites a thread of jurisprudence railing against "the vagaries of eyewitness identification" and "the inherent unreliability of human perception and memory," summarized in *U.S. v. Brownlee*, 454 F. 3d 131 (3 Cir. 2006). He suggests the jury was not rational to accept Wells's testimony, the circumstantial evidence was weak, and the state failed to negate the reasonable probability of misidentification. He concludes the conviction must be reversed.

The standard of appellate review for a sufficiency of the evidence claim in a criminal case is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia, supra*; *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604 (2004). The *Jackson* standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a means to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Galloway*, 55,591 (La. App. 2 Cir. 4/10/24), 384 So. 3d 1167.

The *Jackson* standard also applies in cases involving both direct and circumstantial evidence. When the direct evidence is viewed in the light most favorable to the prosecution, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983); *State v. Galloway, supra*.

Likewise, if a case rests essentially on circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. The appellate court will review the evidence in the light most favorable to the prosecution and determine whether an alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. *State v. Calloway*, 07-2306 (La. 1/21/09), 1 So. 3d 417; *State v. Galloway, supra*.

Where there is conflicting testimony concerning factual matters, the resolution of which depends on a determination of the credibility of the witnesses, the matter is of the weight of the evidence, not its sufficiency. *Tibbs v. Florida*, 457 U.S. 31, 102 S. Ct. 2211 (1982); *State v. Galloway*, *supra*. The appellate court neither assesses the credibility of witnesses nor reweighs evidence. *State v. Kelly*, 15-0484 (La. 6/29/16), 195 So. 3d 449; *State v. Galloway*, *supra*. Rather, the reviewing court affords great deference to the jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Robinson*, 02-1869 (La. 4/14/04), 874 So. 2d 66, *cert. denied*, 543 U.S. 1023, 125 S. Ct. 658 (2004); *State v. Galloway*, *supra*.

In a case where a defendant claims he was not the person who committed the offense, the *Jackson* standard requires the prosecution to negate any reasonable probability of misidentification. *State v. Young*, 20-01041 (La. 5/13/21), 320 So. 3d 356; *State v. Galloway*, *supra*. In assessing the reliability of a witness's identification of the defendant, courts weigh the following factors against the corrupting effect of a potentially suggestive police station identification: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the witness's level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. *Neil v. Biggers*, *supra*; *Manson v. Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243 (1977); *State v. James*, *supra*.

Second degree murder is defined, in pertinent part, as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1 (A)(1). Hines does not contest the

sufficiency of the evidence of a killing or of specific intent; rather, he contests the sufficiency of the evidence that he was the offender. On close review, we find the evidence more than sufficient that Hines was the shooter. Wells was inside the store, facing the door, when Hines entered and drew attention to himself by shouting at someone and then leaving abruptly. The interior video shows excellent lighting and a clear opportunity to view the intruder's face. An instant later, while sitting in the Tahoe, Wells saw the same person facing him directly and aiming a gun at him, circumstances that would focus anyone's attention on the gunman in a potentially lethal situation. Shortly after the shooting, Wells told Det. Henry that he would be able to identify the shooter. These facts more than adequately satisfy the standards of opportunity to view, degree of attention, and level of certainty. *Neil v. Biggers*, *supra*. The facts do not support Hines's contention that viewing the videos tainted Wells's identification: Wells specifically denied this, and it does not fit the timeline of the investigation drawn by Det. Henry. Finally, we acknowledge the scholarly debate about the problems with eyewitness identification, astutely noted in *U.S. v. Brownlee*, *supra*, but we do not find that they warrant overturning the jury's decision to accept Wells's account of seeing the gunman, his positive selection of Hines from the photo lineup, and his later identification of Hines in court. On this record, the jury was entitled to accept Wells's testimony that Hines was the shooter.

Moreover, the circumstantial evidence is compelling. Bullets found at the scene of the crime were linked to the handguns found at the house where Hines was staying; the selfies taken on Hines's iPhone 2½ hours before the

9

shooting showed him wearing a shirt that closely resembled the one worn by the shooter; the videos from C.F. Biggs and Stone Vista showed Hines getting into the red Cruze and trying to distance himself from A1. Against this evidence, the jury could reasonably discount certain facts argued strenuously at trial, such as that no fingerprints or DNA could be lifted from the Glocks found in the recycle bin at the house where Hines was staying on Lancaster Street, that some of the projectiles were too deformed to be linked to any particular weapon, or that officers failed to take DNA samples from the blood on A1's parking lot. These minor facts do not detract from the strength of the identification and the circumstantial evidence of guilt.

Viewed in a light most favorable to the prosecution, the evidence is sufficient to negate any reasonable probability of misidentification. This assignment of error lacks merit.

### *Ineffective Assistance of Counsel*

By his second assignment of error, Hines urges that trial counsel provided ineffective assistance of counsel as guaranteed by the Sixth Amendment. He concedes the question is normally raised by post-conviction relief ("PCR"), *State v. Seiss*, 428 So. 2d 444 (La. 1983), and the standard is whether counsel's errors denied the accused a just result, *U.S. v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039 (1984). He also concedes that photos are generally admissible, if they shed "any light upon an issue in the case," *State v. Landry*, 388 So. 2d 699 (La. 1980), *cert. denied*, 450 U.S. 968, 101 S. Ct. 1487 (1981). However, he argues the selfies from the blue iPhone were highly prejudicial, since they showed him in clothing similar to that worn by the shooter and the surveillance videos were not very clear. Also, trial counsel even conceded that his failure to move to suppress these photos

may have been ineffective assistance. Hines also argues it was ineffective for trial counsel to file no motion to suppress the photo lineup, which may have been conducted improperly; he submits there was no "strategic reason" for failing to challenge this evidence. He asks this court to reverse or, alternatively, to recognize his right to assert the issue by PCR.

Claims of ineffective assistance of counsel are more properly raised by application for PCR in the trial court because it provides the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930.8. *State v. Carter*, 10-0614 (La. 1/24/12), 84 So. 3d 499, *cert. denied*, 568 U.S. 823, 133 S. Ct. 209 (2012). However, when the record is sufficient, allegations of ineffective assistance may be resolved on direct appeal in the interest of judicial economy. *State ex rel. Bailey v. City of W. Monroe*, 418 So. 2d 570 (La. 1982); *State v. Ward*, 53,969 (La. App. 2 Cir. 6/30/21), 324 So. 3d 231.

The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2064 (1984); *State v. Wry*, 591 So. 2d 774 (La. App. 2 Cir. 1991). A conviction will be overturned if the petitioner proves that (1) counsel's performance fell below prevailing professional norms, and (2) counsel's inadequate performance prejudiced the petitioner to the extent that the trial was rendered unfair and the verdict suspect. *State v. Legrand*, 02-1462 (La. 12/3/03), 864 So. 2d 89, *cert. denied*, 544 U.S. 947, 125 S. Ct. 1692 (2005); *State v. Washington*, 491 So. 2d 1337 (La. 1986).

The assessment of an attorney's performance requires that his conduct be evaluated from counsel's perspective at the time of the occurrence. A

reviewing court must give great deference to trial counsel's judgment, tactical decisions, and trial strategy, strongly presuming that he has exercised reasonable professional judgment. *State v. Tillman*, 15-0635 (La. 9/25/15), 175 So. 3d 950; *State v. Ward*, *supra*. A defendant making a claim of ineffective assistance must identify certain acts or omissions by counsel that led to the claim; general statements and conclusory charges will not suffice. *Strickland v. Washington*, *supra*; *State v. Ward*, *supra*.

The specific omission asserted by Hines is trial counsel's failure to move to suppress Wells's photo identification and the selfies on Hines's iPhone. On the record presented, the prospect that such motions would have been granted is very small. The selfies resulted from a search warrant for the house on Lancaster Street, and a later search warrant for the blue iPhone found there; Hines has identified no defects in the affidavits, the warrants themselves, or the execution of the searches. Similarly, Det. Henry testified that he delegated the preparation of the photo lineup to another officer to *avoid* tainting the process; Hines offers only speculation that this precaution reached the opposite result. On this evidence, the claim of ineffective assistance would fail. *State v. Jones*, 10-1026 (La. 10/1/10), 48 So. 3d 210; *State v. Turner*, 52,510 (La. App. 2 Cir. 4/10/19), 267 So. 3d 1202, *writ denied*, 19-00873 (La. 9/24/19), 279 So. 3d 386.

Still, if Hines can uncover any evidence to support these or other claims of ineffective assistance, the procedure of La. C. Cr. P. art. 924 et seq., with its attendant procedural requirements, would be the proper forum to present it. On the current record, this assignment of error lacks merit.

## CONCLUSION

For the reasons expressed, Cortez De'Shun Hines's conviction and sentence are affirmed.

**AFFIRMED.**